UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD COLE, 93-R-0685,

                        Plaintiff,

v.

JACQUELINE LEVITT, Doctor and
ARTHUR TURNBULL, Correctional Officer,
Wende Correctional Facility,

                        Defendants.
_____

**DECISION AND ORDER**

07-CV-00767(M)

     In accordance with 28 U.S.C. §636(c), the parties have consented to jurisdiction by a United States Magistrate Judge [11].[1] Before me is defendants' motion for summary judgment [26]. For the following reasons, defendants' motion is GRANTED in part and DENIED in part.

**BACKGROUND**

     Plaintiff commenced this 42 U.S.C. §1983 action *pro se* by complaint filed November 14, 2007 [1]. He alleges that defendant Jacqueline Levitt, M.D., a physician at the Wende Correctional Facility ("Wende"), was deliberately indifferent to his chronic back condition (first cause of action) and that she retaliated against him for filing grievances. Id., second cause of action. According to plaintiff, defendant Arthur Turnbull, a correctional officer at Wende, also retaliated against him for his grievances. Id., third cause of action.

     Following the conclusion of discovery, defendants moved for summary judgment.

---

    [1]      Bracketed references are to the CM/ECF docket entries.

## ANALYSIS

**A.    Deliberate Indifference**

       Plaintiff argues that Dr. Levitt was deliberately indifferent to his condition by her "fail[ure] to provide medical care recommended by other doctors".  Plaintiff's Memorandum of Law [38-6], p. 6.  In response, defendants argue that plaintiff was provided with adequate health care while under the treatment of Dr. Levitt, and that plaintiff's arguments amount to a disagreement with Dr. Levitt's medical judgment, which cannot form the basis of a deliberate indifference claim.  Defendants' Memorandum of Law [30], p. 5.

        In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Defendants do not dispute that plaintiff suffers from a serious medical condition.  Rather, they focus on whether Dr. Levitt's conduct amounted to deliberate indifference.

       The "deliberate indifference" standard consists of both objective and subjective components.  Hathaway v. Coughlin, 37 F. 3d 63, 66 (2d Cir. 1994), cert. denied, 513 U.S. 1154 (1995). Under the *objective* component, the alleged medical need must be "sufficiently serious." Id.  A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Id.  "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v.

Armstrong, 143 F. 3d 698, 702 (2d Cir. 1998). "The medical condition does not have to occur immediately; it suffices if the condition presents itself 'in the next week or month or year.'" Moore v. McGinnis, 2004 WL 2958471, *6 (W.D.N.Y. 2004) (Siragusa, J.).

To satisfy the *subjective* component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. Hathaway v. Coughlin, 99 F. 3d 550, 553 (2d Cir. 1996). "The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Id. *See also* Hernandez v. Keane, 341 F. 3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Plaintiff was transferred to Wende in October 1999. Zimmermann Declaration [29], Ex. A, p. 21. At that time he was continued on his prior back pain medications by Drs. Panzel and O'Connell. Id., pp. 23-24. These doctors also continued to provide him with a tens unit,[2] and continued with his prior medical restrictions, which included being fed in his cell, restricted from work, and permitted him to take daily showers, carry a cane and have a double mattress. Id., p. 26. These restrictions were continued by a May 17, 2004 Medical Restriction

---

[2] "A tens unit provides electronic stimulation and is designed to help with back pain". Levitt Declaration [47], ¶6.

that ran through May 17, 2005.  Levitt Declaration [47], ¶6; Ex. A, Bates No. 5.  According to plaintiff, Drs. Panzel and O'Connell encouraged him to be physically active to treat his back pain.  Id., p. 28.

Dr. Levitt began treating plaintiff in Spring of 2004.  On May 19, 2004, Dr. Levitt and Howard Gerena, M.D., requested that plaintiff receive hot packs and deep massage for six weeks.  Id., Bates No. 581.  On May 28, 2004, plaintiff requested to be seen by a physician regarding "gym permit & med renewal".  Id., Bates No. 563.  At that time, plaintiff did not have any difficulty ambulating, sitting or standing and had no complaints of discomfort.  Id.

Plaintiff's Percocet prescription ran out on May 31, 2004, and he began requesting a renewal on June 1, 2004.  Id.  At that time, it was observed that plaintiff could get out of his bed and ambulate without apparent difficulty or discomfort.  Id.  Following a renewed request for Percocet on June 3, 2004, Dr. Levitt prescribed plaintiff Motrin and Robaxin as alternative pain medications.  Id., ¶11, Bates No. 564.

On June 15, 2004, plaintiff was prescribed 30 days of Percocet by another provider.  Id., ¶13; Bates No. 565.  On July 15, 2004, plaintiff complained of "sharp pain" from right knee buckling.  Id., Bates No. 567.  On July 19, 2004, another provider renewed plaintiff's Percocet prescription for an additional 30 days.  Id., ¶16; Bates No. 568.  On July 22, 2004, a physician assistant requested that plaintiff's need for Percocet be evaluated.  Dr. Levitt reviewed the notes and ordered Percocet for plaintiff on July 28, 2004.  Id., ¶17; Bates No. 568.

On August 10, 2004, plaintiff was seen for complaints of low back pain and Dr. Levitt continued plaintiff on Percocet. Id., ¶19; Bates No. 569.  As a result of plaintiff's

August 18, 2004 complaints of knee pain, an orthopedic consultation and continuation of Percocet were recommended.  <u>Id</u>., Bates Nos. 570-571.  Dr. Levitt approved these recommendations. <u>Id</u>., ¶20; Bates No. 572.  On September 20, 2004, Dr. Coniglio performed the orthopedic consultation and recommended arthroscopy of the right knee.  <u>Id</u>., Bates No. 575.  However, plaintiff later declined undergoing arthroscopy.  <u>Id</u>., ¶34; Bates No. 580.  On October 4, 2004, plaintiff requested to be assigned to the gym program.  <u>Id</u>., Bates No. 572.

On October 28, 2004, Dr. Levitt examined plaintiff and noted that he subjectively suffered from chronic low back pain and right knee pain.  <u>Id</u>., ¶31; Bates No. 579.  She also noted that there had been no x-ray of plaintiff's back since an October 2003 x-ray, which indicated a mild disc bulge at L3-L4.  At that time, Dr. Levitt "decided on a plan was [*sic*] to decrease the Percocet to two tablets orally twice a day for two weeks.  Then one tablet orally twice a day".  <u>Id</u>., ¶¶3, 31.  She also started him on Nasporsyn, a non-narcotic analgesic.  <u>Id</u>.

Although plaintiff's medical records indicated that he had been prescribed narcotic medications intermittently for the previous ten years, "in [Dr. Levitt's] experience, narcotics are not indicated for long-term use in chronic disease, and are in fact, potentially harmful."  <u>Id</u>., ¶3.  Dr. Levitt "explained this to [plaintiff] at length on a number of occasions".  <u>Id</u>., ¶3; Zimmermann Declaration [29], Ex. A, p. 37.  Dr. Levitt concedes that plaintiff "refused the analgesic medications and claimed that only the narcotics were effective as pain medications."  <u>Id</u>.  However, "[t]his response  strongly suggest[ed] to [Dr. Levitt] what is known as drug-seeking behavior".  <u>Id</u>.

On November 5, 2004, plaintiff complained of problems urinating and on November 16 requested an eye exam and an increase in his pain medication.  <u>Id</u>., Bates No. 579.

On November 8, 2004, plaintiff filed a grievance alleging that Dr. Levitt had decreased his dosage of Percocet in retaliation for his "recent complaints concerning medication refills". Plaintiff's Declaration [38], Ex. B.  Plaintiff was seen by Dr. Levitt on November 18, 2004. Levitt Declaration [47], ¶35; Ex. A, Bates No. 582.  At that time she noted "Percocet recently ineffective", and prescribed Prosac and Methadone to assist him with the discontinuation of the Percocet.  Id., ¶¶35, 37.  She also ordered an optometry referral. Id.  Additionally, Dr. Levitt issued a new Medical Restriction, which restricted plaintiff from work and school, required plaintiff to be fed in his cell, and permitted him to carry a cane.  Id., Bates No. 966. The Medical Restriction, which ran through November 18, 2005, also scheduled plaintiff for the gym exercise program four times per week. Id.  It was Dr Levitt's medical judgment that increased physical activity would reduce plaintiff's back pain.  Id., ¶37.

However, the November 18, 2005 Medical Restriction, which superseded the earlier Medical Restriction, did not include a double mattress or daily showers, as it was Dr. Levitt's "judgment that they were not medically necessary." Id., ¶37.  On December 3, 2004, plaintiff underwent a complete physical examination.  At that time it was noted that his back pain was "status quo".  Id., ¶38; Bates No. 582.  On December 22, 2004 and January 21, 2005, Dr. Levitt continued plaintiff's Methadone prescription for 30 days.  Id., ¶¶42, 45.

Plaintiff was seen by Dr. Levitt on January 28, 2005.  Id., ¶46, Ex. A, Bates No. 586.  At that time, plaintiff indicated that his back pain was partially relieved by the Methadone and that his right knee pain was intermittent.  Id.  Plaintiff was continued on Methadone and prescribed Roboxin, Aspirin and Tylenol.  Id.  On February 8, 2005, plaintiff advised Dr. Levitt that the combination of Methadone and Tylenol she had prescribed was doing "absolutely

nothing to alleviate the pain" and asked her to reinstate his prescription for Percocet. Plaintiff's Declaration [38], Ex. C.

Dr. Levitt saw plaintiff on January 28, 2005, and at that time, there was no indication to increase plaintiff's Methadone dosage. Levitt Declaration [47], ¶47. Because plaintiff indicated that he was not getting any relief from his daily dosage of Methadone, Dr. Levitt's plan was to refill plaintiff's Methadone prescription for two weeks and she "would then considered [*sic*] a non-narcotic prescription with tapering off of the Methadone". Id., ¶48. Therefore, on March 8, 2005, plaintiff's daily dosage of Methadone was decreased, (id., ¶49). On March 10, 2005, plaintiff complained of "incessant pain" and because of the "adverse effects brought about by the [Methadone]", he again requested that he be prescribed Percocet and filed a complaint with the facility. Cole Declaration [38], Ex. D.

On March 16, 2005, plaintiff was seen by Dr. Levitt after he had an allergic reaction to the Methadone, which caused him to lose consciousness. Id. at ¶9. On that date plaintiff agreed to discontinue his prescription for Methadone. Levitt Declaration [47], ¶50, Ex. A, Bates No. 588. On March 17, 2005, Dr. Clemens prescribed plaintiff Ibuprofen and he noted that a pain clinic consultation was scheduled. Id., ¶51, Bates No. 588. On March 17, 2005, plaintiff filed a grievance, complaining that "every time I register a complaint concerning my medical treatment, I am subjected to a medical punitive sanction." Plaintiff's Declaration [38], Ex. D. The Inmate Grievance Program Central Office Review Committee ("CORC") denied the grievance finding, *inter alia*, that plaintiff had been scheduled for an appointment with the pain management clinic. Id.

On March 18, 2005, plaintiff refused to go to the pain management clinic. Levitt Declaration [47], ¶52, Ex. A, Bates No. 589. On March 21, 2005, plaintiff agreed to attend the pain management clinic and was provided with a tens unit. Id., ¶53, Bates No. 589. On March 24, 2005, plaintiff went to sick call for pain medication for his back pain and Dr. Levitt prescribed him Aspirin and Roboxin. Id., ¶54, Bates No. 590. Plaintiff was next seen by Dr. Levitt on May 2, 2005 for complaints of back pain. Id., ¶56; Bates No. 614. Dr. Levitt referred plaintiff to the pain clinic and noted that the tens unit provided plaintiff some relief. Id. She continued plaintiff's prescriptions and started him on Trilisate. Id.

Dr. Levitt alleges that on May 12, 2005 plaintiff was seen at sick call and requested a renewal of his medical restrictions. Id., ¶57, Bates No. 615. However, plaintiff "categorically denies" that he requested cell confinement and disputes that Dr. Levitt had the authority to impose cell confinement without a consultation with plaintiff. Plaintiff's Declaration [38], ¶12.

Dr. Levitt issued a Medical Restriction through June 12, 2005 that continued the previous restrictions, but revoked plaintiff's permission to participate in recreation. Id., ¶¶58, 59; Bates No. 971. Dr. Levitt alleges that she revoked plaintiff's access to recreation because "gym is a precious resource to be used by all inmates, including those using it for rehabilitation purposes, and Mr. Cole had been given special access to the gym for many months. . . . I issued the restrictions because Mr. Cole was adamant that he needed to be fed in cell and could not work or go to school due to his back pain. It is not medically sensible to provide him with ambulatory restrictions in some areas but not others." Id., ¶59. These restrictions were continued by Dr. Clemens from June 14, 2005 through July 14, 2005. Id., Bates No. 972.

Plaintiff filed a grievance on May 13, 2005 challenging his cell confinement (id., ¶13)[3], and on May 16, 2005, he complained to the medical staff about the recreation restriction. Levitt Declaration [47], Ex. A, Bates No. 616. The Inmate Grievance Resolution Committee ("IGRC") recommended "for the grievant to be evaluated a.s.a.p., and for Dr. L. to desist from placing restrictions on individuals without first seeing them." Plaintiff's Declaration [47], Ex. F. However, the Superintendent found no retaliation and "[t]he IGRC does not have the authority to assess and determine medical protocol". Id.

Dr. Levitt saw plaintiff on May 19, 2005, and at that time she questioned plaintiff's need for a cane to ambulate because he indicated that he could walk without it. Id., ¶61; Bates No. 616. At that time, plaintiff indicated that he did not want to continue physical therapy. Id. Dr. Levitt's plan was to obtain a copy of the October 13, 2001 MRI and "possibly to get a repeat MRI thereafter". Id. She ordered an increase in plaintiff's Trilisate dosage. Id.

On June 6, 2005, plaintiff was seen by Chetan Malik, MBBS, at the ECMC Musculoskeletal Pain Clinic, who found that plaintiff had chronic back pain with decreased sensation in his lower left limb. Id., Bates No. 603. Dr. Malik recommended that plaintiff undergo an electromyogram and nerve conduction study of the left leg to rule out radiculopathy, physical therapy, and be prescribed Elavil. Id., Bates No. 604. On June 9, Dr. Levitt reviewed Dr. Malik's report and prescribed Elavil. Id., ¶63; Bates No. 616. However, plaintiff refused to take Elavil and the prescription was discontinued by Dr. Levitt. Id., ¶64; Bates No. 617.

On June 28, 2005, plaintiff was seen by Dr. Levitt for side effects from the Trilisate, which she discontinued, and was prescribed Fioricet. Id., ¶¶68, 83, Bates Nos. 624,

---

[3] The grievance upon which plaintiff relies (Ex. F) is not legible.

681.  Plaintiff also requested that the recreation restriction be discontinued.  Id.  Instead, Dr. Levitt issued a Medical Restriction through December 30, 2005 removing all restrictions, except plaintiff's cane permit.  Id., Bates No. 969.  Dr. Levitt "eliminated feed-in-cell since it was [her] medical opinion that this was actually an impediment to Mr. Cole's rehabilitation. Discontinuing feed-in-cell by definition increases mobility".  Id., ¶70.

On July 1, 2005, Dr. Levitt continued plaintiff's Robaxin and Aspirin prescriptions for 90 days.  Id., ¶72; Bates No. 620.  On July 13, 2005, plaintiff's electromyogram referral was scheduled for August 26, 2005.  Id., ¶71; Bates No. 619, 622.

An August 8, 2005, physical therapy consultation recommended that plaintiff undergo physical therapy along with a home exercise program.  Id., ¶¶76-78.  However, on September 26, 2005 plaintiff requested to discontinue physical therapy.  Id., Bates No. 623.

On October 28, 2005, Dr. Levitt approved plaintiff's request for a renewal of his Fioricet prescription.  Id., ¶85; Bates No. 625.  At that time, plaintiff was "observed . . . carrying cane @ times".  Id.  On December 27, 2005, plaintiff requested a special permit to allow him to attend gym four days per week.  Id., ¶88, Bates No. 626.  Dr. Levitt denied this request because plaintiff's in-cell exercise program, which he was following regularly, was adequate.  Id.

Dr. Levitt did not renew plaintiff's cane permit after it lapsed on December 31, 2005. Id., ¶89.  "In [her] medical opinion  the use of the cane was an impediment to Mr. Cole's rehabilitation.  Discontinuing the use of the cane helped increase his mobility and movement leading to improved muscle strength and benefits overall health as well.  After using a cane for over eight years, he walked without it for over one year once it was discontinued."  Id.

Plaintiff's cane was confiscated on May 15, 2006. Plaintiff's Declaration [38], ¶18. According to plaintiff, ambulating without a cane caused his feet and ankles to swell making it difficult to walk and caused extreme pain. Id. He also alleges that in mid-2007 he encountered problems with his left knee as a result of being forced to ambulate without a cane. Id., ¶19. Plaintiff's grievance regarding Dr. Levitt's refusal to renew his cane permit was denied because "[t]he investigating Medical Director reviewed grievant's medical record and observed grievant's ability to ambulate at the time of her interview. The Medical Director confirms that the grievant was provided with physical therapy and has received numerous medical tests. The Medical Director includes a statement from the Physical Therapist who reports that physical therapy was discontinued at grievant's request on 09/26/05. At that time the Physical Therapist reported that use of a cane was no longer necessary." Id., Ex. J.

On January 9, 2006 Dr. Levitt renewed plaintiff's prescription for Roboxin and on March 6, 2006 renewed his prescription for Fioricet. Levitt Declaration [47], ¶¶90 and 91; Bates No. 627. Dr. Levitt contends that it was her "professional opinion that the problem was being managed satisfactorily" because plaintiff made no mention of back pain when she saw him on December 27, 2005, May 1, 2006, or June 12, 2006. Id., 92, Bates Nos. 626, 1004-1007.

On June 16, 2006, plaintiff was seen by Dr. Levitt . Id., ¶93. At that time he was taking Fioricet, Robaxin, and Aspirin. Although Dr. Levitt alleges that she "continued to treat Mr. Cole with non-narcotic pain medicine and muscle relaxants" (id. at ¶94), plaintiff alleges that "on December 5, 2006 the defendant refused to prescribe plaintiff anything more than inefficacious medications". Plaintiff's Declaration [38], ¶20. On December 7, 2006, plaintiff filed a grievance arising from Dr. Levitt's conduct. Id., Ex. K. The IGRC reached a deadlock on

his grievance with two of the four representatives finding that "[g]rievant has been receiving the same medication for degenerative back problems since 1997. The doctor has renewed grievant's medication for several years . . . . Suddenly the doctor claims the medication is not necessary any longer without meeting with grievant to properly assess his medical condition. Although the IGRC has no authority to recommend medical treatment, this appears to be a pattern of mistreatment and malpractice by the RMU. . . . Prisoners should not be taken off medication or denied treatment without being properly assessed by medical, just to save the State some money. Prisoners are entitled to adequate medical treatment." Id. However, the Superintendent denied the grievance finding that the "[i]nvestigation indicates grievant was assessed for his medical needs and was given the appropriate medication. It is not IGRC practice to second guess the medical staff recommendations as there has been no medical training. There is no evidence of mistreatment or malpractice within the medical staff". Id. On January 31, 2007, CORC upheld the Superintendent's determination noting that "grievant was prescribed an alternate pain analgesic, and is approved for consultation with his primary care provider which is pending scheduling". Id.[4]

Plaintiff argues that Dr. Levitt deviated from the treatment he received from his prior physicians by discontinuing his prescription for Percocet, a narcotic pain killer, and prescribing less efficacious, non-narcotic, pain medications. Plaintiff's Memorandum of Law [38-6], pp. 6-8. Plaintiff alleges his Percocet prescription was discontinued as the result of a policy-shift following an inmate being found in possession of a large quantity of unprescribed

_____

[4] There do not appear to be any medical progress notes from June 2006 through February 2007. Levitt Declaration [47], Ex.A, Bates Nos. 637, 638. However on February 22, 2007, plaintiff received a prescription for Robaxin from Dr. Levitt. Id., Bates No. 638.

Percocets, rather than concerns for plaintiff's well-being.  Id. p. 7.  In response, Dr. Levitt argues

that she weaned plaintiff off of Percocet because "narcotics are not indicated for long-term use in

chronic disease, and are in fact, potentially harmful". Levitt Declaration [47], ¶3.  She also

alleges that plaintiff's self-described need for Percocet was consistent with drug-seeking

behaviors. Id., ¶4.

       Plaintiff offers little more than speculation for his assertion that Dr. Levitt

discontinued his Percocet prescription as a result of a policy decision.  While Dr. Levitt's

treatment plan for plaintiff may have differed from the treatment he received from his previous

physicians, this alone does not raise a triable issue as to whether Dr. Levitt was deliberately

indifferent.  See Williams v. Smith, 2009 WL 2431948, *9 (S.D.N.Y. 2009) ("a prison doctor

who relies on his medical judgment to modify or disagree with an outside specialist's

recommendation of how to treat an inmate is not said to act with deliberate indifference.").

       Plaintiff also challenges Dr. Levitt's conduct in issuing seemingly contradictory

medical restrictions.  For example, she issued a Medical Restriction on November 18, 2004,

which restricted plaintiff from work and school, required plaintiff to be fed in his cell, and

permitted him to carry a cane, but eliminated his permission to use a double mattress and take

daily showers, and permitted him to attend the gym exercise program four times per week. Levitt

Declaration [47], Ex. A, Bates No. 966.  At that time, it was Dr Levitt's medical judgment that

increased physical activity would reduce plaintiff's back pain and it was also her medical

judgment that a double mattress and daily showers were unnecessary.  Id., ¶37.  However,

approximately six months later Dr. Levitt changed course by restricting  plaintiff's participation

in recreation, because "gym is a precious resource to be used by all inmates, including those

using it for rehabilitation purposes, and Mr. Cole had been given special access to the gym for many months. . . . I issued the restrictions because Mr. Cole was adamant that he needed to be fed in cell and could not work or go to school due to his back pain.  It is not medically sensible to provide him with ambulatory restrictions in some areas but not others." Id., ¶¶58, 59, Bates No. 971. Approximately one month later on June 28, 2005, Dr. Levitt changed course again, by lifting all of plaintiff's restrictions, except his cane permit (id.,  Bates No. 969), because in  her "medical opinion [in-cell feeding] was actually an impediment to Mr. Cole's rehabilitation. Discontinuing feed-in-cell by definition increases mobility".  Id., ¶70.  Dr. Levitt also failed to renew plaintiff's cane permit after it lapsed on December 31, 2005.  Id., ¶89.

Dr. Levitt's determination that increased mobility could assist in plaintiff's rehabilitation appears consistent with plaintiff's own desires to have his recreation restrictions lifted. It was also consistent with the medical staff's observations of plaintiff on June 21, 2005 that he could sit, stand and ambulate without difficulty and "offers little c/o pain or discomfort". Levitt Declaration [47], ¶67; Bates No. 618.  Plaintiff was also encouraged by Drs. O'Connell and Panzel - whose conduct is unchallenged by plaintiff - to undertake physical activity to treat his back pain.  Zimmermann Declaration [29], Ex. A, pp. 27-28.

Rather than suggesting indifference, the record demonstrates that plaintiff's complaints were addressed.  "Deliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired."  Shire v. Greiner,  2007 WL 840472, *12 (S.D.N.Y. 2007).  Instead, plaintiff must establish that defendants "acted with a sufficiently culpable state of mind, *i.e*., deliberate indifference. He must therefore show that prison officials intentionally denied, delayed access to,

or intentionally interfered with prescribed treatment." <u>Tafari v. Stein</u>, 2009 WL 331378, *6 (W.D.N.Y. 2009) (Scott, M.J.), <u>reconsideration</u> <u>denied</u>, 2009 WL 1322317, 2004 WL 1579530.

At most, plaintiff has established that Dr. Levitt's treatment plan constituted negligence or malpractice, but do not rise to the level of culpable recklessness. *See* <u>Calloway v. Denane</u>, 2009 WL 3064781, *4 (N.D.N.Y. 2009) ("Allegation of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness"). Dr. Levitt continuously treated plaintiff's condition with pain relievers, referred him to a pain clinic, an orthopedic consultation and  physical therapy, provided him with a tens unit, and encouraged physical activity.  When plaintiff's prescriptions caused side-effects or were not effective, his medications were changed.

Mindful that "determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients", <u>Mendoza v. McGinnis</u>, 2008 WL 4239760, *11 (N.D.N.Y. 2008), I do not find that any deliberate indifference can be inferred from Dr. Levitt's conduct.  Although plaintiff  may question the propriety of the pain medications prescribed by Dr. Levitt and her decision to lift his medical restrictions, "disagreements over treatment do not rise to the level of a Constitutional violation", <u>Graham v. Gibson</u>,  2007 WL 3541613, *5 (W.D.N.Y. 2007) (Siragusa, J.), as "the Constitution does not require that an inmate receive a particular course of treatment".  <u>Tafari</u>, <u>supra</u>, 2009 WL 331378, at *7.

Therefore, I order that plaintiff's deliberate indifference claim against Dr. Levitt (first cause of action) be dismissed.

**B.      Retaliation Claims**

Because of the  "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated", courts shall "examine prisoners' claims of retaliation with skepticism and particular care."  Colon v. Coughlin, 58 F. 3d 865, 872 (2d Cir.1995).  "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.'"  Graham v. Henderson,  89 F. 3d 75, 79 (2d Cir. 1996). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof". Green v. Phillips, 2006 WL 846272, *3 (S.D.N.Y. 2006).

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal v. Goord, 558 F. 3d 119, 128 (2d Cir. 2009).

"More than conclusory allegations are required to survive a summary judgment motion; the 'types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives.'"  Lane v. Carpinello,  2009 WL 3074344, *26 (N.D.N.Y. 2009). However, where "circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required."  Bennett v. Goord,  343 F. 3d 133, 139 (2d Cir. 2003).

### 1. Dr. Levitt

Plaintiff alleges that Dr. Levitt retaliated against him for filing grievances by prescribing pain medications that were ineffective in treating his back pain and by failing to provide him with reasonable accommodations for his condition. Plaintiff's Memorandum of Law [38-6], pp. 8-11.

Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory. *See* Goros v. Pearlman, 2007 WL 1423718, *3 (N.D.N.Y. 2007) (After dismissing the plaintiff's deliberate indifference claim against the plaintiff's doctor, the court also dismissed the plaintiff's retaliation claim against that doctor finding that "plaintiff also contends that defendant refused plaintiff treatment in retaliation for engaging in protected speech. For the reasons discussed there is insufficient evidence that plaintiff was denied medical treatment. Accordingly, the First Amendment claim must fail.").

Therefore, plaintiff's retaliation claim against Dr. Levitt (second cause of action) is dismissed.

### 2. Officer Turnbull

Plaintiff alleges a continuous course of retaliatory conduct by Officer Turnbull for his numerous grievances that began with his grievance against Officer Turnbull for restricting his access to the gym. Complaint [1], ¶¶16-21; Plaintiff's Memorandum of Law [38-6], pp. 12-18. Defendants primarily challenge Officer Turnbull's personal involvement in the allegedly

-17-

retaliatory conduct by arguing that "[p]laintiff's allegations against Officer Turnbull endows him with more power at Wende than he actually possesses." Defendants' Memorandum of Law [30], pp. 8-10. To a lesser degree, defendants argue that plaintiff "can show no facts which support an inference of a casual connection between the adverse actions and the protected conduct". Id., p. 7. However, defendants do not contest the first and second elements necessary to establish a retaliation claim.

I have addressed each of Officer Turnbull's alleged retaliatory acts individually.

### a.    Gym Callout

During 2004 and 2005, Officer Turnbull was one of the four hall captains for B-Block, plaintiff's cell block. Turnbull Declaration [27], ¶¶1, 4. As discussed earlier, on November 18, Dr. Levitt issued a Medical Restriction which contained the following handwritten note: "Gym exercise program 4x/wk." Levitt Declaration [47], Ex. A, Bates No, 966; Turnbull Declaration [27], Ex. A.

Plaintiff alleges that on January 6, 2005, he heard Nurse Overman inform Officer Turnbull of the November 18, 2004 Medical Restriction and indicated that she would send him a copy. Prior to this, plaintiff was apparently unaware of the order. Thus, on January 6, 2005, plaintiff filed a grievance for Officer Turnbull's interference with Dr. Levitt's order. Plaintiff's Declaration [38], Ex. M. Plaintiff alleges that before Officer Turnbull became aware of his grievance, he was granted access to the gym on January 8, 2005. Id., ¶27. However, when Officer Turnbull learned of the grievance, he refused him further access to the gym. Id.

On January 25, 2005, IGRC recommended that "the medical order be adhered to by security staff in housing block" and on February 17, 2005, the Superintendent granted plaintiff's grievance and stated "[a]s of 1/17/05, you have been assigned to Physical Education-A.M." Id., Ex. M. However, plaintiff alleges that these decisions were not honored by Officer Turnbull. Id., ¶28.

Officer Turnbull gives a different version of events. He alleges that he was not aware of the gym callout until January 19, 2005, when he was informed by Sal Agro, Wende's Recreation Program Leader, that plaintiff would be called to the gym for exercise in the evening. Id., ¶5.[5] Officer Turnbull made a notation of this on B-Block's copy of the Medical Restriction (Ex. A), but did not work the evening shift so he was unaware of whether his notations were being followed. Id., ¶6. He alleges that on or about March 17, 2005, he was informed by B-Block Sergeant Lambert that plaintiff would report to the gym in the morning four times per week and made a notion on B-Block's copy of the Medical Restriction. Id., ¶7. On March 22, 2005, Helen Dean, the Deputy Superintendent for Programs, sent plaintiff a memorandum advising him that he was assigned to the gym physical education program in the morning and specified the days for his attendance. Id., Ex. B. This memorandum was copied to the B-Block hall captain. Id.

---

[5]     Agro submitted a signed statement in support of plaintiff's opposition stating that "to the best of my recollection and memory never spoke to anyone at anytime concerning Inmate Cole's . . . use of the recreation programs gym weight room during non inmate program time." Plaintiff's Declaration [38], Ex. 4. He also submitted a declaration in support of defendants' motion stating that "[a]fter four years I can not recall one way or the other, whether I had such a conversation with Mr. Turnbull". Agro Declaration [43], ¶12.

On April 4, 2005, Deputy Superintendent Dean rescinded her March 22, 2005 memorandum stating, "[y]our medical restriction states no work/no school. This includes the Physical Education Program". Id., Ex. C. Because this memorandum was not received by B-Block on April 4, 2005, a misbehavior report was erroneously entered by Officer Croston against plaintiff for his refusal to report to the gym program on April 4, 2005. Id., ¶¶13, 14. In contrast, plaintiff alleges that knowing that Deputy Superintendent Dean had rescinded her order, Officer Turnbull instructed Officer Croston to order plaintiff to report to the gym. Plaintiff's Declaration [38], ¶34.

On May 2, 2005, Deputy Superintendent Dean changed course again stating "[y]ou have a medical restriction and the doctor states gym exercise four times per week. To comply with the doctor's orders, you will be permitted to go to the gym in PM Modules, Monday through Thursday." Levitt Declaration [47], Ex. B, Bates No. 21. However, plaintiff alleges that he was unaware of this memorandum until he was informed by Officer Mann that he had permission to go the gym. Plaintiff's Declaration [38], ¶37. At that time, plaintiff heard Officer Turnbull tell Officer Mann that plaintiff could not go to the gym pursuant to Deputy Superintendent Dean's orders. Id. Plaintiff filed a grievance as a result of this incident. After investigating the grievance, the IGRC noted that "[t]here is an on-going problem inn [*sic*] regards to B-block 7 to 3 shift Hall Capt. interfering with Inmate medical issues". Id., Ex. S.

Officer Turnbull alleges that he did not refuse to implement plaintiff's medical order, but rather he lacked authority to send plaintiff to the gym for exercise without a callout for a scheduled time of the day. Turnbull Declaration [27], ¶¶4, 11. According to Officer Turnbull, "[t]he Program Civilian, the Gym Rec. Civilians, and the Deputy Supt. of Programs had the

authority to initiate inmate Cole's access to the gym" and that "[i]n no way, did [he] stop inmate

Cole from going to the gym once the schedule for Inmate Cole was assigned." Id. ¶¶8, 10; Agro

Declaration [45], ¶5 ("an inmate is not allowed out of his cell during program time unless the

Hall captain has received a change sheet form the Program Committee, informing him where the

inmate is going during a particular program time slot").  In contrast, plaintiff alleges that the

normal facility procedure would have been for Turnbull to contact "the Recreation Supervisor

(C. Snowden) to arrange to have plaintiff to report to the gym to determine a module schedule

(morning or afternoon)."  Plaintiff's Declaration [38], ¶29.  He also offers the declaration of

Harry Packer who alleges that he was the subject of a medical request on or about November 8,

2005 from Dr. Levitt  to Officer Turnbull to attend the gym five days a week for physical therapy

and that Officer Turnbull "caused the same to be implemented without any interference or

assignment to the Physical Education Department, via the institutional program committee".  Id.,

Ex. L.

        Based on these contradictory accounts, I find that plaintiff has raised a triable

issue of fact as to whether Officer Turnbull was personally involved in the alleged failure to

provide him access to the gym.  As to Officer Turnbull's alleged retaliatory motive, defendants

fail to dispute or offer any explanation for why plaintiff was granted access to the gym on

January 8, 2005 before Officer Turnbull allegedly became aware of his grievance.  Plaintiff's

Declaration [38], ¶27.  They also fail to address or rebut plaintiff's allegation that

notwithstanding Deputy Superintendent Dean's  memos, every time plaintiff requested to go to

physical therapy, he was advised by Officer Mann that "Turnbull said that plaintiff did not have

permission to go to the gym" Id., ¶33.

I am mindful that plaintiff was denied access to the gym prior to plaintiff's January 6, 2005 grievance complaining about this conduct. *See* Coleman v. Beale, 2009 WL 1976044, *4 (W.D.N.Y. 2009) (Larimer, J.) ("The undisputed evidence makes clear that plaintiff's grievances against Beale were a response to, not a cause of, the actions that she took toward him."). However, plaintiff alleges that he was granted access to the gym on January 8, 2005, but was promptly denied any further access when Officer Turnbull learned of his January 6, 2005 grievance. Thus, plaintiff has established a temporal proximity between Officer Turnbull learning of plaintiff's grievance and plaintiff being prohibited from further access to the gym.

Moreover, in response to plaintiff's April 12, 2005 grievance, the IGRC found that "[t]here is an on-going problem inn [*sic*] regards to B-block 7 to 3 shift Hall Capt. interfering with Inmate medical issues". Id., Ex. S. Thus, plaintiff was partially vindicated in the grievance process. *See* Burton v. Lynch, 2009 WL 3286020, *13 (S.D.N.Y. 2009) ("Plaintiff has not provided any allegations regarding his disciplinary record, but he has alleged other facts which corroborate his claim of retaliation. While all levels of the inmate grievance process determined that there was 'no evidence of malice' on Dr. Supple's part, they all found that Dr. Supple had, by his own admission, prescribed Plaintiff a medication to which he was allergic. . . . Plaintiff was thus was partially 'vindicated' at a hearing on the matter.").

Giving plaintiff the benefit of every favorable inference, as I must on this motion, I find that plaintiff has raised a triable issue of fact as to whether Officer Turnbull was personally involved in restricting plaintiff's access to the gym and whether this was in retaliation for his grievances against him.

### b. Keep Lock

As discussed earlier, on June 28, 2005, Dr. Levitt issued a Medical Restriction through December 30, 2005 removing all restrictions, except plaintiff's cane permit, which was directed to the "block hall captain". Levitt Declaration [47], Ex. A, Bates No. 969.  Plaintiff alleges that Officer Turnbull refused to honor Dr. Levitt's Medical Restriction and kept him confined in his cell for an additional 14 days.  Complaint [1], ¶20.  As a result, plaintiff filed a complaint with Deputy Post on July 4, 2005 that "Turnbull refuses to honor and/pr release me from medical keep-lock status - - - in short, I am still under 24-hour cell confinement".  Levitt Declaration [47], Ex. B, Bates No. 29.

Officer Turnbull alleges that on June 28, 2005, plaintiff and another inmate were "keeplocked" for investigation by the B-Block Sergeant Lambert and released the next day. Turnbull Declaration [27], ¶15.  According to Officer Turnbull, he did not have the authority to keeplock inmates without the Block Sergeant's approval (id.), and "[a]t no time was inmate Cole imprisoned by myself for an additional 14 days in refusal to honor Dr. Levitt's rescission order. The Tier Hearing Officer is in charge of inmate Cole's disposition.  Further, the Block Sergeant authorizes a keep-lock pending, the Hall Captains to do not have authority to do so." Id., ¶16.[6]

In response, plaintiff alleges that "the cell confinement was not the result of any disciplinary action and did not require a Tier Hearing Officer's decision" and that it was Turnbull's delegated responsibility to release all cell confinements on the morning of their

---

[6]     Although not addressed by Officer Turnbull on July 16, 2005, he sent a memorandum to Sergeant Lambert in response to plaintiff's July 5, 2005 complaint indicating that he was "not aware of any memo from a Dr. Levitt, and today is my first day returning to work since July 1, 2005". [15-4], Bates No. 223.

respective expiration dates.  Plaintiff's Declaration [38], ¶41.  According to plaintiff, Officer Turnbull had an assigned inmate clerk to assist him with all cell confinement expiration dates. Id., ¶42.  He also relies on July 13, 2005 declaration of Harold Pecker, the inmate clerk for B-Block, stating that "[i]n early July of 2005 . . . while reviewing inmates medical restrictions in the company of officer Kyle, I pointed to him that according to inmate Richard Cole [*sic*] latest medical restrictions, he was technically released from his prior medical keep-lock status, yet he was still confined to his cell.  Officer Kyle stated 'Well you know the Bull,' referring to B-Block Hall Captain A. Turnbull".  Id., Ex. X.

Based upon the conflicting accounts of Turnbull's authority over plaintiff's keeplock status, I find that plaintiff has raised a triable issue of fact as to Officer Turnbull's personal involvement in this incident.  Defendants offer no explanation as to why plaintiff remained in keeplock confinement after his medical restrictions were lifted by Dr. Levitt on June 28, 2005.  There being at least some evidence presented that Officer Turnbull's conduct was intentional, considering this conduct in conjunction with plaintiff's prior grievances against Officer Turnbull and giving plaintiff every favorable inference, I find that there is a triable issue of fact as to whether Officer Turnbull's conduct was in retaliation for plaintiff's grievances.


c.    **Religious Services**

Plaintiff alleges that Officer Turnbull refused to permit him to attend a religious service to celebrate Rosh Hashanah on September 14, 2005. Complaint [1], ¶38. Officer Turnbull argues that this claim is meritless because he was not at work on September 20, 2005, the date

alleged in plaintiff's grievance,[7] and to the extent plaintiff is referring to Yom Kippur (October 13, 2005), he alleges that the religious callout was not listed on the master callout sheet. Turnbull Declaration [27], ¶18; Ex. D, The Superintendent's October 26, 2005 Response to Plaintiff's Grievance ("The Sergeant states that the grievant may have quoted the wrong date on the grievance. October 13th was the date for Yom Kippur. On that date, the Yom Kippur callout was not listed on the master callout sheet. As a result, this problem was not rectified until 2:15 p.m., after the grievant had left or [*sic*] his afternoon assignment".).

In contrast to the allegations of his complaint, plaintiff appears to clarify that he is referring to the incident that occurred on Yom Kippur. He alleges that on October 13, 2005 there was a callout over the public address system at 1:35 p.m. for Jewish services. Plaintiff's Declaration [38], ¶46. He also relies on the declaration of Douglas Williams dated October 18, 2005 who states that he was permitted to go to Yom Kippur services on October 13, 2005 at approximately 1:30 p.m. Id., [38], Ex. 3.

Based upon the conflicting accounts of what occurred on October 13, 2005 and whether other inmates were permitted to attend Yom Kippur services on that date, I find that plaintiff has raised a triable issue of fact as to Officer Turnbull's personal involvement in this incident. Considering the various grievances and other conduct allegedly undertaken by Officer Turnbull, I also find that there is a triable issue as to whether Officer Turnbull's conduct in prohibiting plaintiff from attending Yom Kippur Services was in retaliation for plaintiff's grievances.

---

[7]     Plaintiff's grievance dated September 14, 2005 alleged that Turnbull denied him permission to attend Yom Kippur on September 13, 2005 (rather than September 20, 2005). Plaintiff's Declaration [38], Ex. 2.

Therefore, I deny defendants' motion insofar as it seeks to dismiss plaintiff's third cause of action against Officer Turnbull for retaliation.

**CONCLUSION**

For these reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part. The parties shall appear on January 6, 2010 at 10:00 a.m. to schedule a trial date. Defendants' counsel shall arrange for plaintiff's telephonic appearance and provide the court with a telephone number where he can be contacted. The court will initiate the call.

Dated: December 4, 2009

**SO ORDERED.**

/s Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge